## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KURT R. PERRINE,

     *Plaintiff,*

*v.*                        CASE NO. 10-CV-14934

COMMISSIONER OF          DISTRICT JUDGE MARK A. GOLDSMITH
SOCIAL SECURITY,         MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and supplemental

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf.  This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

security income (SSI) benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 9.)

Plaintiff was 47 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 88, 146.) Plaintiff's employment history includes work as a manager/ decorator at a bakery for 16 years. (Tr. at 178.) Plaintiff last worked in 1994. (*Id.*)

Plaintiff filed the instant claim on October 30, 2006, alleging that he became unable to work on August 1, 2001. (Tr. at 146.) The claim was denied at the initial administrative stages. (Tr. at 84.) In denying Plaintiff's claims, the Defendant Commissioner considered multiple sclerosis and affective disorders as possible bases of disability. (*Id.*) On April 28, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Ethel Revels, who considered the application for benefits *de novo*. (Tr. at 85-98.) In a decision dated May 28, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 98.) Plaintiff requested a review of this decision on July 8, 2009. (Tr. at 16-17.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on October 25, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On December 13, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.      Standard of Review**

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S.

137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon

3

an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program (DIB) of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program (SSI) of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v),(g)).

## D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since September 12, 2006, the application date. (Tr. at 55.) At step two, the ALJ found that Plaintiff's hypertension, anemia, osteoarthritis, anxiety, personality disorder, attention deficit hyperactivity disorder

6

("ADHD"), and post-traumatic stress disorder ("PTSD") were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 56-57.) At step four, the ALJ found that Plaintiff has no past relevant work. (Tr. at 60.) At Step Five, the ALJ found that Plaintiff retained the residual functional capacity to perform a limited range of light work. (Tr. at 57-60.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 62.)

### E.   Administrative Record

### 1.   Mental Impairments

A review of the relevant medical evidence contained in the administrative record indicates that on February 2, 2007, Plaintiff was referred by the Disability Determination Services ("DDS") for a psychiatric evaluation. (Tr. at 338-40.) Atul C. Shah, M.D., diagnosed Plaintiff with major depressive disorder, recurrent with psychotic features and partial remissions. (Tr. at 340.) His prognosis was "fair." (*Id.*) The evaluation noted that Plaintiff "has never been hospitalized and has not had counseling" for any mental health issues. (Tr. at 339.)

A Psychiatric Review Technique completed on February 15, 2007, diagnosed Plaintiff with affective disorders, specifically, major depressive disorder, recurrent, with psychotic features. (Tr. at 363, 366.) Plaintiff was found to be mildly limited in activities of daily living and mildly limited in maintaining concentration, persistence and pace, but was not limited in any other areas. (Tr. at 373.)

A Mental Residual Functional Capacity Assessment of February 15, 2007, concluded that Plaintiff is moderately limited in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, and his ability to maintain attention and concentration for extended periods, but is otherwise not significantly limited in understanding, memory, and

sustained concentration and persistence. (Tr. at 351-52.) Plaintiff was also found to be moderately limited in the ability to interact appropriately with the general public and to respond appropriately to changes in the work setting, but was otherwise not significantly limited in his social interaction and adaptation skills. (Tr. at 352.) The evaluator found "Major Depressive Disorder with Psychotic Feature in Partial Remission" and stated that the "claimant[']s Mental Status Examination reveal[ed] good mental functioning including memory, attention, and concentration." (Tr. at 353.) Furthermore, "[t]he ADLs show good functioning with the claimant taking care of his personal needs, driving, cooking, and shopping" although "[h]e does complain about memory problems." (*Id*.) The evaluator concluded that

> the claimant [was] partially credible. He retains the mental capacity to sustain an independent routine of work activity. He is able to tolerate low stress social demands and adapt to simple changes in routine. He may be more limited at meeting more complex and detailed work demands.

(*Id*.)

### 2.    Physical Impairments, Including Multiple Sclerosis

The record medical evidence reveals that Plaintiff was treated at the Michigan Institute for Neurological Disorders ("MIND") since August 2001, when he was diagnosed with multiple sclerosis. (Tr. at 248-49.) On January 15, 2002, Plaintiff was referred to and assessed by Howard S. Rossman, D.O. (Tr. at 248-49.) Dr. Rossman indicated that  Plaintiff "is actually doing quite well now" and, after prescribing Paxil for depression, indicated that he would "monitor his response closely with further recommendations at the time of reassessment for his relapsing multiple sclerosis." (Tr. at 249.)

In March 2002, Dr. Rossman noted that Plaintiff would remain on "his present combination of Avonex and Copaxone thereapy." (Tr. at 251.) Dr. Rossman also stated that "an MRI would be taken of the lumbar spine to rule out structural pathology," although  Dr. Rossman opined that

Plaintiff's "lower extremity symptoms are again most likely of 'central' origin." (*Id.*) An MRI was taken of the lumbar spine on March 20, 2002, which revealed "[l]umbar spondylosis," but also found "no associated disc herniation or acquired canal stenosis." (Tr. at 252.)

On July 16, 2002, Dr. Rossman noted that Plaintiff reported that he had been "forgetting things," "at times he has had some stumbling," and has "some intermittent double vision." (Tr. at 253.) On November 19, 2002, Dr. Rossman noted that Plaintiff reported "decreased memory and decreased attention span," "hand numbness and headaches," and "tremulousness," but "no double vision." (Tr. at 255.) Dr. Rossman noted that Plaintiff's "complaints are quite profound at this time but his objective exam is not too bad." (Tr. at 255.)

On November 27, 2002, Dr. Rossman stated that an "MRI of the brain is reviewed and it continues to demonstrate numerous demyelinating plaques above and below the tentorium; however, the overall pattern is improved compared to the previous exam of 08/23/01. There is no gadolinium enhancement." (Tr. at 257, 258.) Dr. Rossman concluded that Plaintiff was "stable neurologically." (Tr. at 257.)

On February 11, 2003, Plaintiff reported to Dr. Rossman that "things are 'status quo.'" (Tr. at 259.) Dr. Rossman noted that Plaintiff was "ambulatory without difficulty." (Tr. at 259.) On June 18, 2003, Dr. Rossman noted that Plaintiff was "fairly stable with regard to the physical symptoms [that] are manifestations of his disorder, although he continues to complain of fatigue and also complains of forgetfulness with short-term memory disturbance. He does have a mild unsteady gait as exhibited by a mild gait ataxia on exam today." (Tr. at 261.)

Chest x-rays taken on May 4, 2000, and June 18, 2003, were "normal." (Tr. at 263, 288.) X-rays of Plaintiff's abdomen taken on May 5, 2000, were also normal. (Tr. at 290-91.)

On October 30, 2003, Dr. Rossman noted that Plaintiff "has had no new neurologic signs or symptoms. He is doing well overall. He continues to be ambulatory. He is awake and alert.  No upper extremity weakness is noted." (Tr. at 264.) On July 8, 2004, Dr. Rossman noted that "[n]eurologically, he is stable and no changes are made in his medication regimen . . . ." (Tr. at 267.)

On November 14, 2004, Plaintiff reported to Dr. Rossman that he was "'sore and fatter' than ever, [that he] has headaches seven days per week[,] . . . has pain down his spine[,] . . . [and] still cannot sleep at night." (Tr. at 269.) However, Plaintiff's physical exam was good that day and he was "fully ambulatory." (*Id.*) Dr. Rossman noted that he needed to update Plaintiff's scans of the brain and cervical spine. (*Id.*)

On November 21, 2004, an MRI of Plaintiff's cervical spine showed "[s]ome increased cord signal on STIR sequences that may represent some areas of plaquing. There is no enhancing lesion identified within the cervical cord. Disc bulging is noted at C5-C6 and C6-C7." (Tr. at 286.) On November 21, 2004, an MRI was also taken of Plaintiff's brain which showed "[b]ilateral plaques consistent with provided history of demyelinating process. Plaque is somewhat more numerous on the left than right and there is a solitary enhancing plaque in the left frontoparietal junction measuring approximately 5 millimeters. No mass effect or edema is seen." (Tr. at 286.)

On February 7, 2005, an MRI of the lumbar spine showed "[d]egenerative disc disease with desiccation extending from L2 to S1. There are degenerative endplate changes at L5-S1 with small central disc hernia seen at this level. This does not encroach upon the thecal sac or exiting nerve root sleeves. Additional disc bulging seen at L2-3, L3-4 and L4-5." (Tr. at 284.)

On March 17, 2005, Dr. Rossman noted that an "MRI scan of the brain and cervical spine from November of 2004 . . . demonstrat[ed] bihemispheric plaquing with an enhancing plaque in

the left frontal parietal region measuring about 5 mm [and that t]he MRI scan of the cervical spine does demonstrate increased signal at various cord levels without enhancement." (Tr. at 271.) On July 28, 2005, Dr. Rossman noted that "no new relapse activity has been identified." (Tr. at 273.)

Plaintiff underwent a colonoscopy on September 7, 2005, which yielded normal results. (Tr. at 242.) An electroencephalogram ("EEG") taken on November 9, 2005, showed "EEG within normal variation during drowsiness and physiological sleep." (Tr. at 275.)

An MRI performed on November 14, 2005, showed a "[s]table appearance to the brain . . . with radiographic manifestations to support the clinical diagnosis of multiple sclerosis." (Tr. at 283.) On December 8, 2005, Dr. Rossman reviewed an "[u]pdated MRI scan" which failed to "demonstrate evidence for new or active disease." (Tr. at 276.)

On October 12, 2006, Plaintiff reported to Dr. Rossman that "he still has urinary dribbling and hesitancy. He is concerned about memory problems and his partner states that Kurt indeed has times [sic] remembering the days of the week and does appear to be intermittently confused." (Tr. at 278.) Dr. Rossman noted that Plaintiff would be referred to urology and noted that Plaintiff "has had no further syncopal or seizure-like episodes over the past year." (Tr. at 278.)

An MRI performed on October 30, 2006, showed "[e]xtensive white matter changes . . . located within the supratentorial and infratentorial regions of the brain. This is consistent with the patient's known diagnosis of multiple sclerosis." (Tr. at 281.) In addition, the MRI results showed "[e]nhancement of plaques consistent with active disease" and "[n]ew plaques identified within the right cerebellum, bilateral middle cerebellar peduncles as well as the right frontal lobe." (Tr. at 282.)

A Physical RFC performed on February 15, 2007, concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and could stand about 6 hours and sit about

11

6 hours in an 8-hour workday. (Tr. at 356.) Plaintiff was found to be occasionally limited in all postural areas and did not have any manipulative, visual, communicative or environmental limitations. (Tr. at 357-59.)

On August 28, 2007, Plaintiff underwent L4-L5 decompression surgery with L2-S1 instrumentation and fusion for lumbar stenosis. (Tr. at 378-86.) Plaintiff also underwent physical therapy after surgery and was discharged after having "achieved all or most goals and is independent with an HMP." (Tr. at 387-401, 397.)

On October 23, 2007, Dr. Rossman noted that Plaintiff "was able to make it through the stressors surrounding the [back] surgery without any worsening or exacerbation of underlying symptoms." (Tr. at 430.) Dr. Rossman stated, "I feel he is stable neurologically at this time." (Tr. at 431.)

On January 22, 2008, Dr. Rossman noted that Plaintiff was continuing to recover from back surgery and that Plaintiff was "stable neurologically and will continue his dual disease-modifying therapy with Avonex and Caopaxone . . . ." (Tr. at 427.)

On July 1, 2008, Dr. Rossman noted that Plaintiff "has a diagnosis of a relapsing-remitting multiple sclerosis, stable on present combination disease-modifying therapy." (Tr. at 420.)

On October 13, 2008, Dr. Rossman's nurse practitioner noted that Plaintiff "received much benefit from steroid therapy," had no double or blurred vision, "still continued to have difficulty with discomfort" despite back surgery, but was "able to walk with a steady gait and completed a 25-foot walk in 6.81 seconds on the first trial and 5.56 seconds on the second trial." (Tr. at 403-04.) It was also noted that an MRI of the brain taken on September 6, 2008, "showed no new or enhancing lesions." (Tr. at 404.) The MRI results themselves corroborate the finding that, although "[t]here is again evidence of extensive white matter changes consistent with the patient's diagnosis

of multiple sclerosis[,] [o]n today's study, there is no evidence of enhancing lesions." (Tr. at 410.)

### 3.    Plaintiff's Daily Activity Report

Plaintiff indicated on his daily activity report that "when able to walk[, he] tr[ies] preparing meals and [doing] various home chores" such as light house cleaning. (Tr. at 165, 167.) Plaintiff further stated that he is able to care for pets by feeding them and letting them outside, and that he is able to take care of all his own personal hygiene. (Tr. at 166.) Plaintiff also indicated that he is able to drive and ride in cars, shop in stores bi-weekly for an hour or so, handle his own personal finances, watch television, play with pets, visit, and watch movies. (Tr. at 168-69.)

### 4.    Administrative Hearing

Plaintiff testified at the administrative hearing that, although his application indicates he was unable to work as of August 2001 when he was diagnosed with multiple sclerosis, he has been unable to work since 1995 or 1996. (Tr. at 25-26.) Plaintiff explained that from 1995 on, until his mother died several years ago, he helped take care of his mother and that helping her did not require any lifting, just cooking and laundry. (Tr. at 26-27.) Plaintiff testified that he uses a cane "off and on" depending on how his balance is. (Tr. at 34.) Plaintiff further testified that he has to use the restroom about "twice an hour." (Tr. at 49.)

The Vocational Expert ("VE") classified Plaintiff's past work in the bakery as light, but with the cake decorator duties it was a job performed at the medium exertional level. (Tr. at 75.) The ALJ asked the VE to consider a person with Plaintiff's background who

> needs work that will allow for a sit/stand option; would not require sitting for more than 45 minutes at a time or standing for more than 30 minutes at a time; no walking more than one block at a time. That work must be simple, repetitive type tasks, because there are moderate limitations in the ability to maintain concentration for extended periods, as well as to remember and carry out detailed instructions, and that is due to both symptoms from the MS impairment, as well as the depression. Our hypothetical claimant also, in addition to those limitations, would need work that does not require him to operate in temperature extremes nor climb stairs. That

13

work must not be at hazardous heights or around dangerous machinery, and I am incorporating in that the no climbing of ropes, ladders or scaffolds. That work must allow for some proximity to a bathroom. If you assume that, what jobs, if any, would a hypothetical claimant be vocationally qualified to perform?

(Tr. at 75-76.) The VE responded that such an individual could perform the 1,000 packager and 2,500 cashier jobs that are light and unskilled and are available in the southeast Michigan area. (Tr. at 76.) In addition, such a person could perform the 1,100 jobs as a sorter, 1,000 jobs as an assembler, and 1,000 as a general office clerk that are all sedentary and unskilled. (Tr. at 76-77.)

The ALJ then asked the VE to assume all the above limitations and the additional limitation that the person uses a cane for support and needs to be away from the work-site two times an hour for approximately five minutes at a time. (Tr. at 77.) The VE responded that the need to be away from the work station two times an hour for five minutes would preclude all work, but that the need to use a cane alone would preclude most jobs, but that such person could perform the information clerk job. (Tr. at 77-78.) The VE testified that the classification requirements of those jobs are consistent with that of the Dictionary of Occupational Titles ("DOT"). (Tr. at 78.)

## F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time he qualified for benefits, Plaintiff possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 91-96.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

"Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ erroneously failed to find that Plaintiff satisfied the criteria for Listing 1.04, failed to give proper weight to Plaintiff's treating physician, Dr. Rossman, substituted her own lay opinion for that of the doctors, and failed to identify the DOT number of occupational classifications of the job the VE found Plaintiff could perform as required by S.S.R. 00-4p. (Doc. 8.)

### a.   Listed Impairment 1.04

Plaintiff contends that the ALJ erroneously failed to find that Plaintiff satisfied the criteria for Listing 1.04. (Doc. 8 at 4.) Listing 1.04 applies to disorders of the spine and requires "[e]vidence of nerve root decompression characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg-raising test (sitting and supine)" or "spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours" or "lumbar spinal stenosis, resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A, B, and C.

A plaintiff's impairment must match all the specified medical criteria in order to show the impairment meets a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990); 20 C.F.R. § 404.1525(c); *Golay v. Comm'r of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003). Plaintiff cannot rely on the "overall functional impact of his unlisted impairment or combination of impairments" to satisfy equivalence to a Listing. *Zebley*, 493 U.S. at 531. Where the record lacks medical evidence supporting limitation in the range of motion and loss of motor reflex, the Listing is not met. *Lawson v. Comm'r,* 192 Fed App'x 521, 529 (6th Cir. 2006).

In the instant case, there is no evidence of "nerve root decompression," "spinal arachnoiditis," "lumbar spinal stenosis," or the other requisite confirming criteria. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A, B, and C. To the contrary, medical evidence offered on these topics indicates that although a 2002 MRI revealed "[l]umbar spondylosis," it also found that "[t]here is no associated disc herniation or acquired canal stenosis." (Tr. at 252.) In addition, Dr. Rossman noted throughout 2003 that Plaintiff was "ambulatory without difficulty" and

"continues to be ambulatory." (Tr. at 259, 267.) In 2004, Dr. Rossman noted that Plaintiff was "fully ambulatory." (Tr. at 269.) Although Plaintiff underwent L4-L5 decompression surgery with L2-S1 instrumentation and fusion for lumbar stenosis in August 2007 (Tr. at 378-86), after some physical therapy Plaintiff was discharged because he "achieved all or most goals and is independent with an HMP." (Tr. at 387-401, 397.) In October 2008, it was noted that Plaintiff was "able to walk with a steady gait and completed a 25-foot walk in 6.81 seconds on the first trial and 5.56 seconds on the second trial." (Tr. at 403- 04.)

This lack of medical evidence regarding meeting the criteria required under Listing 1.04 is, I suggest, fatal to Plaintiff's contention that Listing 1.04 was met. *See West v. Astrue*, No. 3:08-CV-124, 2009 WL 2168683, at *5 (E.D. Tenn. July 17, 2009); *Campbell v. Comm'r of Social Security*, No. 07-13252, 2008 WL 2670218, at *4 (E.D. Mich. June 27, 2008). In addition, I note that there is no medical opinion evidence that Plaintiff meets Listing 1.04. I therefore suggest that Plaintiff's contention that the ALJ erred by finding that he did not meet any Listed Impairment, i.e., Listing 1.04, is without merit.

### b. Treating Source Opinions and the ALJ's "Lay Opinion"

Plaintiff contends that the ALJ failed to give proper weight to Plaintiff's treating physician, Dr. Rossman, and that the ALJ improperly substituted her own lay opinion for that of the doctors, committing error under S.S.R. 96-2p. (Doc. 8 at 6-8.) An ALJ, however, commits no error in weighing the opinions and medical evidence and is expressly authorized to do so within the parameters of the regulations. In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore,

17

a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."

18

20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

In the instant case, I suggest that the ALJ's findings are supported by and not contrary to Dr. Rossman's opinions. In November 2002, Dr. Rossman noted that Plaintiff's "complaints are quite profound at this time but his objective exam is not too bad." (Tr. at 255.) Dr. Rossman stated that an "MRI of the brain" showed that "the overall pattern is improved" and that Plaintiff was "stable neurologically." (Tr. at 257-58.) In June 2003, Dr. Rossman stated that Plaintiff was "fairly stable with regard to the physical symptoms [that] are manifestations of his disorder, although he continues to complain of fatigue and also complains of forgetfulness with short-term memory disturbance." (Tr. at 261.) Dr. Rossman noted "a mild unsteady gait as exhibited by a mild gait ataxia on exam today." (*Id.*) On October 30, 2003, Dr. Rossman noted that Plaintiff "has had no new neurologic signs or symptoms. He is doing well overall. He continues to be ambulatory." (Tr. at 264.) On July 8, 2004, Dr. Rossman noted that "[n]eurologically, he is stable and no changes are made in his medication regimen . . . ." (Tr. at 267.) On July 28, 2005, Dr. Rossman noted that "no new relapse  activity has been identified." (Tr. at 273.) On December 8, 2005, Dr. Rossman noted that an updated MRI scan failed "to demonstrate evidence for new or active disease." (Tr. at 276.)  On October 23, 2007, Dr. Rossman noted that Plaintiff "was able to make it through the stressors surrounding the [back] surgery without any worsening or exacerbation of underlying symptoms." (Tr. at 430.) Dr. Rossman stated, "I feel he is stable neurologically at this time." (Tr. at 431.) On July 1, 2008, Dr. Rossman noted that Plaintiff "has a diagnosis of a relapsing-remitting

multiple sclerosis, [which is] stable on present combination disease-modifying therapy." (Tr. at 420.)

I therefore suggest that the ALJ's findings are not inconsistent with Dr. Rossman's opinion and that they are supported by substantial evidence.

### c.      GAF Scores

Plaintiff argues that the ALJ failed to give proper weight to Dr. Shah's finding that Plaintiff's GAF score was 41-50. (Doc. 9 at 7-8.) Plaintiff, however, is placing greater reliance upon the GAF scores than either the Commissioner or the Sixth Circuit has deemed appropriate.

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). Therefore, I suggest that the ALJ's decision not to rely on the GAF scores is of little consequence and does not undermine the ALJ's substantial evidence finding. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

### d.      Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in discounting Plaintiff's credibility with respect to Plaintiff's claim of "post surgical debilitating pain" and his need to use a cane for ambulation. (Doc. 9 at 3.)

Social Security Regulations prescribe a two-step process for evaluating subjective complaints of pain. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition or (2) the objectively-determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

The issue is whether the ALJ's credibility determinations are supported by substantial evidence. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters*, 127 F.3d at 531. When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility");

*Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished).

After examining the record evidence, I suggest that substantial evidence supports the ALJ's findings, including the finding that Plaintiff's testimony regarding his level of pain was not fully credible. As to mental impairments, Dr. Shah noted that Plaintiff "has never been hospitalized and has not had counseling" for any mental health issues. (Tr. at 339.) Plaintiff's "Mental Status Examination reveal[ed] good mental functioning including memory, attention, and concentration." (Tr. at 353.) Furthermore, "[t]he ADLs show good functioning with the claimant taking care of his personal needs, driving, cooking, and shopping," although "[h]e does complain about memory problems." (*Id*.) Therefore, "the claimant [was found to be] partially credible. He retains the mental capacity to sustain an independent routine of work activity[.]" (Tr. at 353.)

As to physical impairments, although the evidence reveals that Plaintiff does have multiple sclerosis and spinal issues, even Dr. Rossman noted that Plaintiff's complaints exceed that expected by the medical evidence. (Tr. at 255.) In addition, throughout 2003, Dr. Rossman commented that Plaintiff was "stable neurologically," "ambulatory without difficulty," "had no new neurologic signs or symptoms," "is doing well overall," and "continues to be ambulatory." (Tr. at 257, 259, 264.) In 2004, Dr. Rossman noted that "[n]eurologically, [Plaintiff] is stable and no changes are made in his medication regimen . . . . " (Tr. at 267.) An electroencephalogram (EEG) taken in November 2005 showed "normal variation during drowsiness and physiological sleep." (Tr. at 275.) In December 2005, an updated MRI "fail[ed] to demonstrate evidence for new or active disease." (Tr. at 276.)

Although Plaintiff underwent L4-L5 decompression surgery in August 2007 (Tr. at 378-86), after physical therapy Plaintiff was discharged, having "achieved all or most goals and is

independent with an HMP." (Tr. at 387-401, 397.) In October 2007, Dr. Rossman noted that Plaintiff "was able to make it through the stressors surrounding the [back] surgery without any worsening or exacerbation of underlying symptoms." (Tr. at 430.) Dr. Rossman stated that Plaintiff was "stable neurologically at this time." (Tr. at 431.) In 2008, Dr. Rossman again noted that Plaintiff was "stable neurologically and will continue his dual disease-modifying therapy with Avonex and Caopaxone . . . ." (Tr. at 427.) Finally, an MRI of the brain taken in September 2008 "showed no new or enhancing lesions." (Tr. at 404.)

Thus, I suggest that although there is evidence of impairments, there is no evidence that would support Plaintiff's complaints of disabling symptoms or pain. I therefore suggest that the ALJ's credibility findings are supported by substantial evidence.

### e.   S.S.R. 00-4p

Plaintiff contends that the ALJ improperly failed to identify the DOT number of occupational classifications of the job the vocational expert VE found Plaintiff could perform as required by S.S.R. 00-4p. (Doc. 8 at 8.) In this Circuit, however, Social Security Ruling 00-4p is satisfied by the ALJ simply asking the VE if her testimony is consistent with the DOT. *See Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 375-76 (6th Cir. 2006). Therefore, I suggest that the ALJ was not under any obligation to inquire further into the accuracy of the VE's testimony. *See Ledford v. Astrue*, 311 Fed. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge").

### 3.   Conclusion

23

After review of all the record medical evidence, I suggest that the hypothetical questions accurately portrayed Plaintiff's individual impairments in harmony with the relevant objective record medical evidence and Plaintiff's own testimony that he is able to prepare meals, do light house cleaning, care for pets, care for his own personal hygiene, drive and ride in cars, shop in stores bi-weekly for an hour or so, handle his own personal finances, watch television, play with pets, visit with others, and watch movies. (Tr. at 165-69.)

I therefore conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                        CHARLES E. BINDER
Dated: June 1, 2011                     United States Magistrate Judge



### CERTIFICATION

        I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 1, 2011                     By       s/Patricia T. Morris
                                        Law Clerk to Magistrate Judge Binder